hTERRI F. LOVE, Judge.
Plaintiffs in this case, Donald J. Nalty and Frank E. Schmidt, were former directors of D.H. Holmes Company, Ltd., who now claim benefits under the D.H. Holmes Company, Ltd., Executive Savings Retirement Plan. Defendants, D.H. Holmes Company, Ltd., claim that Plaintiffs are not eligible for benefits because the directors violated the Interested Directors Statute, and the Plaintiffs were voluntarily terminated. The trial court found that the Plaintiffs did not violate the Interested Directors Statute and are entitled to benefits. For the reasons outlined *3 below, we affirm the judgment of the trial court.
FACTS AND PROCEDURAL HISTORY
Donald J. Nalty (“Nalty”) and Frank E. Schmidt (“Schmidt”) were members of the D.H. Holmes Company, Ltd. (“Holmes”) board of directors (“Board”) in 1985. On March 27, 1985, they participated in a Board meeting at which the D.H. Holmes Company, Ltd., Executive Savings Retirement Plan (“Plan”) was adopted. Participation in the Plan was offered to corporate officers, divisional vice presidents, and Board members under the age of seventy. The Plan was marketed Land sold to Holmes by Charles Marks (“Marks”) of Management Compensation Group (“MCG”), an Atlanta-based benefits company, which specializes in nonqualified deferred compensation and life insurance funding. The Plan’s purpose was to assist in the retention of middle and senior management. Mr. Gary Snyder, an Atlanta lawyer and counsel for MCG, drafted the Plan.
Of the twelve-member Board, eleven were present and the Plan was adopted by unanimous vote. Nalty and Schmidt were among those present and who voted for the Plan. Nalty and Schmidt joined the Plan in the spring of 1985; each elected to defer $7,200.00 per year, for eight years. Nalty was born September 28, 1933, making him 51 years old on May 1, 1985, the Plan’s effective date. Schmidt was born October 6, 1934, making him 50 years old. Both Nalty and Schmidt contributed $28,800.00 to the Plan before voting for the merger of Holmes and Dillards Department Stores, Inc. (“Dillards”), which resulted in their being replaced as directors.
Participants could elect to defer compensation in the amounts and for the number of years specified in Schedule A of the Plan. The initial deferral election could be up to 30% of the participant’s compensation, with a minimum deferral of $5,000.00 a year for eight years. All-compensation deferred was placed in a Deferred Benefit Account maintained separately for each participant.
Article V of the Plan dealt with retirement benefits. The Plan provided for a normal retirement when a participant retired from full-time employment after reaching normal retirement age, and an early retirement benefit no sooner than' the | plater of (a) the participant reaching age 60 or (b) the Participant completing eight years of Plan participation.'
Article VII of the Plan outlined the benefits payable in the event of voluntary or involuntary termination of participants. If a participant voluntarily left employment for any reason other than retirement, death or disability prior to the Early Retirement Date, he would be entitled to a lump sum Termination .Benefit equal to the total of his Deferred Benefit Account, plus interest. If Holmes terminated a partich pant before his Early Retirement Date for any reason other than for cause, and he had completed -all of his compensation deferrals, he would be entitled to a Termination Benefit equal to the Normal Retirement Benefit he would have received if he had remained in continuous employment until Normal Retirement Date and retired pursuant to paragraph 5.1 of the Plan. If a participant had not completed all of his compensation deferrals when he. was involuntarily terminated, he would only receive the amount in his Deferred Benefit Account, plus 10% annual interest, payable in a lump sum.
In 1989, Holmes was merged into a subsidiary-of'Dillards. Nalty and Schmidt attended a March 6, 1989, board meeting at which the terms and conditions of the proposed Agreement and Plan of Merger (“Merger Agreement”) -were discussed. Nalty and Schmidt were present at the *4 April 12, 1989, board meeting when the merger was approved. In addition to voting for the merger as directors, Nalty and Schmidt voted in favor of the merger at the May 9, 1989, special shareholders’ meeting. At a directors’ meeting immediately following that | ¿meeting, letters of resignation were circulated. Nalty and Schmidt did not sign the resignation letters. The other directors signed the resignation letters.
Nalty and Schmidt claim benefits under the Plan “change in control” provision, arguing Dillards involuntarily terminated them after the merger. The Plan provides greater benefits to Participants involuntarily terminated pursuant to its “change of control” provision, than it gives to Participants who leave voluntarily.
Schmidt claims a retirement benefit of $988,500.00; a death benefit of up to $454,500.00; and a disability benefit of $7,200.00 for the first year, $21,600.00 for years two through eight and $28,800 for year nine to continue consecutively until he attains the age 71. Nalty claims a retirement benefit of $1,080,000.00; a death benefit of up to $439,500.00; and a disability benefit of $7,200.00 for the first year, $21,600.00 annually for years two through eight, and $28,00.00 for year nine to continue consecutively until he attains the age 71.
Nalty and Schmidt argue that their resignation were not voluntary because they refused to sign the resignation letters, and requested a review of the Plan Committee’s decision to that effect. Nalty and Schmidt argue they were involuntarily terminated in connection with a change in control and therefore entitled to benefits as if they had completed their compensation deferral elections. A hearing on the appeal of the Plan Committee’s decision was held February 8, 1995. On April 10, 1995, the Plan Committee reaffirmed the denial of benefits, determining that Article VII, the termination provision, applied only to employees, |finot directors. The termination of benefits provision in Paragraph 7.2(a) did not apply to Nalty and Schmidt.
Nalty and Schmidt filed a petition for declaratory judgment on June 26, 1993, seeking a judgment decreeing:
1) Plaintiffs’ positions as directors were involuntarily terminated pursuant to a “change in control,” when Holmes merged with Dillards Department Stores, Inc. in 1989;
2) Plaintiffs are entitled to change their designated retirement ages from 70 to not less than 60;
3) Plaintiffs are entitled to death benefits under the Plan;
4) Prior determinations of those issues by the D.H. Holmes Company, Ltd. Executive Savings & retirement Plan Administrative Committee (“Plan Committee”) were arbitrary and capricious, contrary to the terms of the Plan, and violated fiduciary duties owed to Plaintiffs; and,
5) The Plan Committee is barred by principle of detrimental reliance, promissory estoppel and unjust enrichment from asserting that Plaintiffs’ termination was voluntary or that Plaintiffs’ retirement age designations are irrevocable.
The petition also prayed for Plaintiffs’ costs and, should the trial court find the Employee Retirement Income Security Act of 1974 (“ERISA”) applicable, their reasonable attorneys’ fees and any appropriate ERISA penalties.
Holmes filed its answer to the Petition for Declaratory Judgment on September 1, 1993, denying Plaintiffs were entitled to any benefits under the Plan, other than *5 the return of their contributions and accrued interest.
On March 27, 1995, Holmes filed a re-conventional demand alleging Nalty and Schmidt breached their fiduciary duty to Holmes by voting in favor of the Plan, because they were “interested directors.” The reconventional demand further alleged that the approval of the plan was improper, because the votes of interested | fidirectors were counted in its adoption and it was never presented to nor approved by Holmes shareholders. Holmes sought a declaration that the Plan was void as to the interested directors, no amounts were due to Plaintiffs, and sought damages equal to all amounts paid to directors under the Plan, costs and attorneys’ fees. Nalty and Schmidt did not file an answer to the reconventional demand.
On November 10, 1998, Nalty and Schmidt filed a motion for summary judgment, seeking a judgment declaring the Plan provisions did not distinguish between employees and directors; that Nalty and Schmidt did not voluntarily resign as directors; and that the Plan Committee abused its discretion in its interpretation of the Plan.
Holmes opposed the motion on the grounds that the supporting affidavits were not based on personal knowledge, contained hearsay statements, asserted conclusory facts and legal conclusions, and attached unidentified and unauthenticated documents. Holmes further opposed the motion on the grounds that there existed disputed issues of material fact, including whether Plaintiffs voluntarily resigned or, if they did not, whether their refusal to do' so constituted a breach of their fiduciary duties under the circumstances; whether the interpretation of the Plan by the Plan Committee comported with a fair reading of the Plan; whether, the “change in control” provision of the Plan applied to directors; and whether -the interpretation of the Plan would result in any unanticipated costs to Holmes.
|70n February 8, 1999, the trial court rendered judgment on Nalty and Schmidt’s motion for summary judgment, granting partial summary judgment in Plaintiffs’ favor, finding them eligible for benefits under the Plan, but finding it was unable to determine their precise benefits without a trial. On January 7, 1999, Holmes filed a motion for summary judgment, seeking dismissal of Plaintiffs’ claims for benefits, on the grounds that the Plan was void as to Plaintiffs because they voted for its adoption as Holmes directors, in violation of the Interested Directors Statute, La. R.S. 12:84.
In response to defendants motion for summary judgment, Plaintiffs filed a cross motion for partial summary judgment, seeking dismissal of Holmes’ reconventional demand, on the grounds that: 1) the material facts were disclosed to the Holmes board of directors; 2) the directors acted in good faith in adopting-the Plan; 3) the Plan was fair to the company at the time it was adopted; and 4) the doctrine of Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R. Co., 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974), barred the reconventional demand.
Holmes’ motion for summary judgment was heard on March 18, 1999. On April 13, 1999, the trial court denied Holmes’ motion. Holmes filed its opposition to Plaintiffs’ cross motion for partial summary judgment on April 20, 1999. After hearing, the trial court granted Plaintiffs’ motion for partial summary judgment and dismissed Holmes’ reconventional demand.
Holmes filed a motion in the district court to certify the February 8, 1999, April 13, 1999, and May 3, 1999, judgments as final, under La. C.C.P. art. 1 «1915(B)(1), *6 and filed a motion and order for devolutive appeal from those judgments on June 2, 1999. This Court dismissed the appeal without prejudice in Donald J. Nalty and Frank E. Schmidt v. D.H. Holmes Co. Ltd., 99-CA-2826 (La.App. 4 Cir. 12/27/00), 775 So.2d 695. This Court held
[cjonsidering the fact that the judgments of February 8, 1999 and May 3, 1999 granted partial summary judgments and the April 13, 1999 judgment denied a motion for summary judgment, the dispositive issue in this appeal is whether these judgments are appealable under La. C.C.P. art.1915, as amended by Acts 1997, No. 483, § 2, effective July 1,1997.[1]
The Court further provided that
We initially note that of the three judgments at issue, only the February 8, 1999 and the May 3, 1999 judgments are partial summary judgments, and thereby subject to the rules of La. C.C.P. art.1915. Although the trial court designated these judgments as final, that order did not contain an “express determination that there is no just, reason for delay.” ... Because of lack of compliance with the rules set forth in the' 1997 version of the La. C.C.P. art.1915 and this Court’s jurisprudence interpreting this article, the February 8, 1999 and May 3, 1999 partial summary judgments do not constitute final, appealable judgments .... The denial of a motion for summary judgment is an interlocutory decree that is not appealable absent a showing of irreparable injury. La. C.C.P. art.2083; Orleans Parish School Board v. Scheyd, Inc., 95-2653, p. 1 (La.App. 4 Cir. 4/24/96), 673 So.2d 274, 275. There has been no showing of how the denial of this motion will result in irreparable injury to D.H. Holmes.... This appeal is dismissed without prejudice. Although D.H. Holmes does not have the right to an immediate appeal due to non-compliance with La. C.C.P. art.1915, it has not lost its right to appeal after final judgment is rendered adjudicating all of the claims, demands, issues and theories as to all parties.
Nalty and Schmidt v. D.H. Holmes Co. Ltd., 99-CA-2826 (La.App. 4 Cir. 12/27/00), 775 So.2d 695
19Plaintiffs filed a motion for partial summary judgment on September 20, 2001, seeking a declaration that Nalty was entitled to retirement benefits totaling $1,080,000.00 and Schmidt was entitled to retirement benefits totaling $988,500.00 under the Plan, plus death benefits for both. Holmes filed an opposition on November 6, 2001, arguing the motion was supported by inadequate affidavits and inadmissible and unauthenticated documents,. and disputed issues of material fact prevented its grant. The trial court denied Plaintiffs’ motion.
Holmes filed a motion for partial summary judgment seeking to strike Plaintiffs’ claim for attorneys’ fees under ERISA. After hearing, the trial court granted the motion to strike.
The amount of benefits was set for trial and submitted on the pleadings, exhibits and trial memoranda. The parties stipulated that, only in the event Plaintiffs were entitled to benefits, Nalty would be entitled to retirement benefits of $72,000.00 per year for fifteen years, beginning the second month after he reached age seven *7 ty; Schmidt would be entitled to retirement benefits of $65,900.00 per year for fifteen years, beginning the second month after he reached the age seventy; and, should either plaintiff die after his retirement benefits commenced, his beneficiary would continue receiving his ■ retirement benefits for the remaining portion of the fifteen years. The parties disagreed as to the benefit payable if Plaintiffs died before the commencement of retirement benefits. The trial court found Plaintiffs were entitled to $57,600.00, in benefits, in the event they died before the commencement of retirement benefits.
J^DISCUSSION
In its first assignment of error, Holmes argues that the trial court committed reversible error in denying its motion for summary judgment, seeking dismissal of Nalty and Schmidt’s petition on the grounds that the Louisiana Interested Directors Statute bars Nalty and Schmidt from claiming benefits under the Holmes Retirement Plan.
Appellate courts review summary judgments de novo, using the same criteria applied by trial courts to determine whether summary judgment is appropriate. Reynolds v. Select Properties, Ltd., 93-1480 (La.4/11/94), 634 So.2d 1180, 1182. This Court in Davis v. Board of Supervisors of LSU and Agric. and Mech. Coll., 97-0382, p. 7 (La.App. 4 Cir. 3/18/98), 709 So.2d 1030, 1033, stated in part:
A summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that- there is no genuine issue as to material fact, and that the mover is entitled to judgment as-a matter of law. The burden of proof remains with the movant. However; if the mov-ant will not bear the burden- of proof at trial on the matter that is before the court on the motion for summary judgment, the movant’s burden on the motion requires him only to point out to the -court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. Thereafter, if the adverse party fails to- produce factual support sufficient to establish that he will be able to satisfy his evidentiary burdén of proof at trial, there is no genuine issue of material fact.
An adverse party to a supported motion for summary judgment may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided by law, must set forth specific facts showing that there is a genuine issue of material fact for trial.
(Internal citations' omitted).
Holmes' argues that given the Nalty and Schmidt’s financial interest in the Plan, the voting directors were considered ‘interested directors’ and the implementation of the Plan must have conformed to the requirements set forth in the Interested Directors Statute, La. R.S. 12:84.
Holmes cites several cases that discuss how transactions between directors and corporations should be scrutinized. See Noe v. Roussel, 310 So.2d 806, 819 (La.1975) (“any agent who acquires his principal’s property; or- one who otherwise acts an a fiduciary capacity, bears the burden of establishing that the transaction was an arms length affair”), and Olinde v. 400 Group, 95-1233 (La.App. 1 Cir. 12/6/96), 686 So.2d 883, 886 (the burden is on the fiduciary not only to prove the good faith of' the transactions involved, but also to show their inherent fairness from the viewpoint of the corporation and its shareholders). Holmes also relies heavily on Rivercity v. American Can Co., 600 F.Supp. 908 (E.D.La.1984), which holds *8 that the disjunctive language in La. R.S. 12:84 and technical compliance with its subsections 1 and 2 did not satisfy a director’s burden of proof where the transaction is unfair to the company. Finally, Holmes cites Dunbar v. Williams, 554 So.2d 56 (La.App. 4th Cir.1989), where the president of the corporation engaged in transactions with his own company to the detriment of his. corporation. In Dunbar, this Court found that the Director’s failure to inquire about the transactions was a breach of fiduciary duty. On rehearing in Dunbar, the panel adopted the holding in Noe.
The cases cited by Holmes; Noe, Olinde, Dunbar, Rivercity, among others, are not persuasive in this instance. First, they are not factually on point, as each case deals with a particular director .or fiduciary engaging in transactions with the corporation. In the case at bar, there was no transaction between the directors and bathe corporation, instead a retirement plan was presented to Holmes by a third party, and adopted by Holmes. The directors were not privy to any benefit that was not also available to the employee/participants of Holmes.
Holmes cites Olinde as supporting authority, however this case contains the following language written by the court, which is contrary to their argument: .
The (Interested Directors) statute does not automatically void an interested director transaction if: 1) it is authorized by vote. only, of the disinterested directors, or ... 3) the transaction was fair to the corporation as of the time it was authorized, approved, or ratified by the board of directors or shareholders.
This undermines Holmes’ argument that the vote of only three disinterested directors is not enough to institute the Plan.
Holmes argues the trial'court incorrectly applied the 'law, and accordingly, improperly granted Plaintiffs’ motion for summary judgment. Holmes further avers that:
Louisiana requires “a majority of the directors present at a meeting at which a quorum is present” to constitute an act of the board. La. R.S. 12:81(c)(7). Eleven of the twelve Board members were present when the Plan was adopted. Two, or even three, uninterested directors do not constitute a majority at an eleven member meeting. Legally the Board could not have adopted the Plan without counting the votes of interested directors, because all but two directors were interested, and two directors did not constitute a majority.
Holmes’ argument about the number of directors voting on the Plan is not supported by the law. La. R.S. 12:81(7) provides in pertinent part
A majority of the board of directors shall be necessary to constitute a quorum for the transaction of business, and thé acts of a majority of the directors present át a méeting at which a quorum is present shall be the acts of the board of clirect'ors. (Emphasis added.)
The record evidences that there were twelve (12) directors on the Board. At the meeting, eleven of the directors were present and participated in the vote to 11,implement the Plan. Of the eleven directors that were present, the record indicates that three of the directors who voted where unable to participate in the Plan and therefore are not considered ‘interested directors’: Hugh Mc.C. Evans, George W. Dodge, and Albert Flettrich. Furthermore, two additional directors who voted for the Plan’s implementation were eligible to, participate in the Plan, but elected not to:' Robert Karem and Stewart Maunsell. Because the board consisted of *9 twelve (12) directors, a quorum required that at least seven (7) directors had to he present to begin a meeting for the purpose of transacting business on behalf of the board. Eleven of the twelve directors were present, thus satisfying the,requisite number of directors to constitute that quorum. We therefore find that this argument has no merit.
However, in assessing whether the presence and participation of the ‘interested directors’ makes the implementation of the Plan voidable, such transactions and contracts are subject to the Interested Directors Statute, La. R.S. 12:84. La. R.S. 12:84 provides in pertinent part
A.' No contract or transaction' ... between a corporation and any other business, nonprofit or foreign corporation, partnership, or other organization in which one or more of its directors or officers are directors or officers or have a financial interest, shall be void or voidable solely for this reason, or solely because the common or interested director or officer was present at or participated in the meeting of the board or committee thereof which authorized the contract or transaction, or solely because his or their votes were counted for such purpose, if:
1. The material facts as to his interest and as to the contract or transaction were disclosed or known to the board of directors or the committee, and the board or committee in 114good faith authorized the contract or transaction by a vote sufficient for such purpose without counting the vote of the interested director or ■ directors; OR
2. The material facts as to his interest and as to the contract or transaction were disclosed or known to the shareholders entitled to vote thereon, and the contract or transaction was approved in good faith by vote ■ of the shareholders; OR
3.The contract or transaction was fair as to the corporation as of the time . it was authorized, approved or ratified by the board of directors, committee, or shareholders.
B. Common or interested directors may be counted in determining the presence of a quorum at a meeting ■ of the board of directors or of a committee, which authorized ■ the contract or transaction.
(Emphasis added.)
Holmes completes its argument by asserting the Plan was unfair to the corporation because the Plan was originally intended only for employees, and that the directors claim nearly a million dollar return on a $28,800.00 investment.
Our duty is to determine whether Plaintiffs were entitled to judgment as a matter of law on this issue. In Rivercity, the court stated, “An interested director bears the burden of proving his good faith in entering into a contract on behalf of his corporation as well as the inherent fairness of such contract from the standpoint of the corporation.” Rivercity v. American Can Company, 600 F.Supp. 908 (E.D.La.1984), affirmed, 753 F.2d 1300 (5th Cir.1985). Nalty and Schmidt have demonstrated good faith in adopting the Plan. They brought in Marks to develop a retirement plan to retain high-level, executive employees. Directors were later added to the list of eligible participants. The Plaintiffs have demonstrated the Plan’s fairness to the corporation, in that employee/participants were eligible for |isthe same benefits as the Plaintiffs, and the Plan was constructed in a manner whereby Holmes would not incur any costs. Plan benefits were to be paid to participants from life *10 insurance policies purchased with contributions to the Plan. Those benefits, once the participant reached the age seventy, were paid out over fifteen years.
Holmes, as the mover, has failed to show that they were entitled to judgment as a matter of law. Further, Nalty and Schmidt have provided ample evidence that the adoption of the Plan was not in violation of La. R.S. 12:84, specifically 12:84 A(3), in that the transaction was fair as to the corporation as of the time it was authorized, approved or ratified by the board of directors. Our review of the record reveals the trial court was correct in granting summary judgment for Nalty and Schmidt based on Holmes failure to demonstrate an error of law or the existence of an issue of material fact.
In its second assignment of error, Holmes argues the trial court committed reversible error in granting partial summary judgment in favor of Nalty and Schmidt dismissing- Holmes’ reconventional demand.
This reconventional demand was instituted by Holmes, urging the trial court to find Plaintiffs violated La. R.S. 12:84 and thus breached a fiduciary duty. Plaintiffs filed a motion for partial summary judgment in response to the reconventional demand.
Based on our findings above, we find that the trial court was correct in granting partial summary judgment for the Plaintiffs on this issue. We further find the trial court did not commit error in dismissing Holmes’ reconventional demand. In this assignment of error, Holmes merely rehashes its argument from the denial of its motion for summary judgment discussed above.
| Kiln its third assignment of error, Holmes argues that the trial court committed reversible error in granting partial summary judgment in favor of Nalty -and Schmidt declaring them eligible for benefits under the Holmes Retirement Plan.
Holmes’ first argument is that the trial court erroneously granted summary judgment in favor of the Plaintiffs because it incorrectly found that the Employee Retirement ' Income Security Act of 1974 (“ERISA”) applied to the Plan. There is no evidence in the record to support this argument. While the ERISA question was presented in relationship to this issue, there is no indication that the trial court made its decision based on a finding that ERISA applied. On the contrary, in a later judgment of the trial court, discussed below, it found that ERISA did not apply to the Plan.
Holmes’ second argument is that the trial court erroneously found for Nalty and Schmidt because the Plan Committee made a correct determination that Nalty and Schmidt were not entitled to benefits under the Plan.
Section 9.1 of the Plan confers authority on the Plan Committee to determine eligibility under the Plan. If the administrator has not given a plan the legally correct interpretation, the court must then determine whether the administrator’s interpretation constitutes an abuse of discretion. In assessing whether there is an abuse of discretion, the Court must first look to whether the Plan Committee’s interpretation was legally correct. Jones v. SONAT, Inc., Master Employee Benefits Plan Administrative Committee, 997 F.2d 113, 115 (5th Cir.1993). In assessing whether the interpretation is legally correct, the court must look to factors such as (1) whether the Administrative Committee has given a uniform construction of the Plan; (2) whether the interpretation is consistent with a fair reading of the Plan; and (3) whether the interpretation results in any unanticipated |17costs. Batchelor v. *11 International Brotherhood of Elec. Workers Local 861 Pension & Retirement Fund, 877 F.2d 441, 444-45.
The Plan Committee concluded that section VII of the Plan, which concerned termination benefits, only applied to employees who terminated employment with the company. However, this interpretation is in contradiction to the language of the Plan. Section of 1.9 of the Plan,- defines a participant as; “An employee or director of Employer who is eligible to participate in this Plan, according to standards adopted by the Plan Committee and who elects to participate in this Plan.” Given that the Plan was conceived and adopted as including directors as participants, it is inconsistent for the Plan committee to now claim that Plaintiffs can be denied benefits because they are not employees. The Plan Committee’s assessment cannot be considered either a fair reading of the Plan, or a uniform construction of the Plan, under Batchelor.
After determining that the Plan Committee interpretation is legally incorrect, the trial court must determine whether the Plan Committee abused its discretion by considering the following factors; 1) whether the Committee’s interpretation is internally consistent with the remainder of the plan, 2) whether the Committee’s interpretation comports with any relevant regulations formulated by the appropriate administrative agencies, 3) whether the factual background supports the Committee’s determination, and 4) any inferences of lack of good faith on the Committee’s part. Jones, 997 F.2d at 115.
Directors were eligible to participate in the Plan as adopted, and Plaintiffs made significant, contributions in reliance on the Plan’s schedule of benefits. The Plan Committee’s interpretation is not internally consistent with the Plan, because they choose to draw a distinction between employees and director, which is not | 1scontained in the language of the Plan. The Plan Committee attempted to establish a distinction between employees and directors upon Nalty and Schmidt’s attempt to claim benefits under the Plan. It is from this action that this Court, .infers a lack of good faith on the part of the Plan Committee, since Nalty and Schmidt were participants according to the Plan, without objection by the Plan Committee, until Holmes merged into Dillards and they sought to collect significant benefits. Given these facts, we find that the Plan Committee abused its discretion in finding the Plaintiffs ineligible to receive Plan benefits.
The Plan Committee further found that Nalty and Schmidt, because they “voluntarily resigned” their directorships, are ineligible for benefits as designated in section 7.1 of the Plan. Plaintiffs assert that they never intended their vote in favor of the merger to be determinative of their benefits under the Plan. Their argument is supported by. the fact that they refused to sign the voluntary resignation form given to the directors. Nalty and Schmidt argue that they understood that as a part of the merger the identity of the shareholders electing the directors would change, but if these new shareholders did not elect the directors they could not be considered voluntarily terminated.
Holmes argues that section 5.3 of the merger agreement granted Dillards the right to require the resignations of one or more of the directors. Section 5.3 addresses pre-merger business and stated that, prior to the merger, if Dillards acquired one million shares, it could have forced the resignation of one or all of the directors. As Nalty and Schmidt note, there is no evidence in the record to suggest that this series of events occurred. *12 Moreover, the fact that Dillards could have forced resignation of the directors in this instance, supports the view that they were not voluntarily terminated.
|U)The trial court found that the Plaintiffs were entitled to benefits under section 7.2 of the Plan, which deals with Participants who are involuntarily terminated due to a change in control. Section 7.2(a) states in pertinent part:
... Notwithstanding the foregoing, in the event such involuntary termination of a Participant occurs in connection with a change in control of Employer, as described in Paragraph 11.1(b), hereof, such Participant shall be entitled to a Termination Benefit determined pursuant to the provisions of paragraph 7.2(b), hereof, as if such Participant had completed all such Compensation Deferral Elections.
Section 7.2(b) states:
In the event that at the time of termination of employment, Participant has completed all Compensation deferrals, pursuant to Schedule A, with respect to any one or more Compensation Deferral Elections, for the full term of such Election, Employer shall pay to such Participant, with respect to such completed Compensation Deferral Elections, and in addition to any amounts payable under Paragraph 7.2(a), hereof, a Termination Benefit determined as follows:
(i) A benefit, equal to the Normal Retirement Benefit Participant would have received, pursuant to Article V, with respect to such Compensation Deferral Election, had Participant remained in continuous employment with Employer until Normal Retirement date and retired from employment with Employer pursuant to Paragraph 5.1, hereof, and be payable pursuant to the provisions of Paragraph 5.5, hereof; or
(ii) If the participant so elects, in writing, to Plan Committee within thirty (30) days of the date of termination, Employer shall pay to Participant, in lieu of the benefit described in Paragraph 7.2(b)®, hereof, a benefit equal to the total amount of such Participant’s Deferred Benefit Accounts, established pursuant to paragraph 4.1, hereof, with respect to such completed Deferred Compensation Elections, determined pursuant to paragraph 4.1, hereof, as of the last day of the month preceding the date of termination of employment, except that the Interest Earnings Adjustment, described in Paragraph 4.3, hereof, shall be determined using the Interest Earnings Rate described in Paragraph 7.1(b), hereof, payable in a lump sum on the first day of the second calendar month following the date of Participant’s termination.
1 ?.nGiven the evidence presented in the motion for summary judgment, we find that the trial court was correct in finding that Nalty and Schmidt were involuntarily terminated and therefore entitled to benefits under section 7.2 of the Plan as outlined above. Since no evidence was presented, which indicated that Nalty and Schmidt made the elections described in 7.2(b)(ii), benefits are due to the plaintiffs as delineated in 7.2(b)®.

Plaintiff’s First and Second Assignment of Errors

In their first assignment of error, Plaintiffs argue that the trial court committed reversible error in finding that the federal law of ERISA did not apply to the D.H. Holmes Executive Savings and Re *13 tirement Plan so as to entitle Plaintiffs to attorney fees. In their second assignment of error, Plaintiffs argue the trial court committed reversible error in striking Plaintiffs’ request to engage in appropriate discovery in furtherance of their claim for attorney fees. Given the interrelated nature of these assignments of error, they will be addressed jointly.
ERISA, 29 USCA § 1002(2)(A) states, in part:
Except as provided in subparagraph (B), the terms “employee pension benefit plan” and “pension plan” mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program ...
However, there are retirement plans not covered under ERISA. Section 1051 states in part:
This Part shall apply to any employee benefit plan described in section 1003(a) of this title (and not exempted under section 1003(b) of this title) other than-
(2) a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred |21 compensation for a select group of management or highly compensated employees;
(7) an excessive benefit plan (exempted from ERISA in 1003(b)(5))
These exceptions are reiterated in sections 1081(A)(3), 1081(A)(9), and 1101(a)(1) of ERISA. Section 1002(36) of ERISA describes the term “excessive benefit plan” as follows:
The term “excess benefit plan” means a plan maintained by an employer solely for the purpose of providing benefits for certain employers in excess of the limitations on contribution and benefits imposed by section 415 of Title 26 or plans to which that section applies without regard to whether the Plan is funded.
Given these restrictions, it is clear that the Plan in question is not covered under ERISA. Of the evidence submitted on the motion for' summary judgment, we found the actual language associated with the plan most persuasive. Section 11.5 of the Plan entitled “Governing Law” states:
This Plan is made pursuant to, and shall be governed by, the laws of the State of Louisiana, in all respects, including matters of construction, validity and performance.
Contained in the “Discussion Draft” of the Plan entitled, Wealth-Op™ are the following points regarding the benefits and administration of the Plan:
i. An'executive retirement income security and wealth'accumulation plan offering attractive alternatives to 401(k).
ii. Holmes purchases cost recovery insurance with executive pre-tax salary deferrals at no cost to company.
iii. Substantially increases retirement benefits to executives and offers superior solution to highly paid individuals who might be limited under 40100.
iv. Eliminated problem of government restrictions on qualified plans.
v. “Golden Handcuff’... Beneficial as . ■ an executive attraction, retention and reward device.
laavi. Separate Administration: handed, for the most part, by Management Compensation Group.
This Plan is excluded from ERISA under 1051(2) and (7). It is both an unfunded plan maintained by an employer to provide deferred compensation for a select group of employees and it is an excess *14 benefit plan as defined by 1002(36). Nalty and Schmidt were unable to demonstrate that the trial court made an error of law or that there exists an issue of material fact with regard to whether ERISA applies to the Plan. However, there is ample evidence, from the language and application of the Plan that it is exempt under ERISA.
Third Assignment, of Error
In their third assignment of error, Plaintiffs argue the trial court committed reversible error in finding that Plaintiffs were only entitled to $57,600.00 in Termination Benefits if death occurred prior to their commencement of benefits at age seventy instead of the full benefits, provided under the plan in lump sum.
After determination by the- trial court that Nalty and Schmidt were entitled to benefits under the Plan, the question as to the amount of benefits due Nalty and Schmidt was submitted for trial on the merits. The parties stipulated that, only in the event Plaintiffs were entitled to benefits, Nalty would be entitled to retirement benefits of $72,000.00 per year for fifteen years, beginning the second month after he reached age seventy; Schmidt would be entitled to retirement benefits of $65,900.00 per year for fifteen years, beginning the second month after he reached the age seventy; and, should either plaintiff die after his retirement benefits commenced, his beneficiary would continue receiving his' retirement benefits for the remaining portion of the fifteen years. The trial court found that in the event I^Nalty and Schmidt died prior to the commencement of their retirement benefits, $57,600.00 would be paid to Nalty and Schmidt, plus all accrued interest determined pursuant to paragraph 4.1 of the Plan, payable over fifteen years.
In its reasons for -judgment the trial court stated that since it already found that Plaintiffs were entitled to benefits,1 an inquiry into the amount of benefits owed must begin with the Plan document and Article VII, which addresses benefits owed to the Participant following involuntary termination of a participant other than for cause.
The trial court stated in its reasons:
Paragraph 7.2(a) of the plan provides that when a participant is terminated as the result of a change in control, the participant is entitled to the termination benefit determined in accordance with 7.2(b). The paragraph further provides that such participants are treated as if they had completed all their compensation deferral elections. Therefore the Plaintiffs are viewed as if they had completed all eight years of required contribution totaling $57,600.00.
The termination benefits set forth in paragraph 7.2(b) provide the participant who has completed the compensation deferral elections with two options. 7.2(b)(ii) regards the participant as one who continued employment with the employer until retirement, thus providing “Normal Retirement Benefits”. 7.2(b)(ii) also allows an election for a lump sum payment of the balance of the participant’s deferred benefit account if made in writing within 30 days of the date of termination. As no evidence has been presented that such an election has been made, the Plaintiffs are entitled to “Normal Retirement Benefits”.
Paragraph 6.2 addresses the benefits owed following the death of the participant after retirement.
If a Participant dies following retirement from full-time employment with Employer, but prior to the payment of all amounts payable to Participant pursuant to Article V, hereof, Employer shall pay to the Beneficiary or Beneficia *15 ries designated in writing by Participant in Schedule A ... The amounts payable to such Beneficiary or Beneficiaries as the result of Participant’s death shall be made payable as follows:
(a) Continuation of Participant’s Retirement Benefit, payable over its remaining term thereof, as if such Participant had not died (in the event participant had begun to receive Retirement | ¡^Benefits, pursuant to Article V hereof, prior to Participant’s death); or
(b) If Participant had not yet begun to receive his Retirement Benefit, pursuant to Article V hereof, prior to his death, the amount of such Participant’s Death Benefit, determined pursuant to Paragraph 6.3....
This paragraph specifically addresses the instance where the death of a retired participant occurs prior too the receipt of retirement benefits. Paragraph 6.2(b) indicates that the determination of death benefits under such circumstances are to be made in accordance with Paragraph 6.3. Of this paragraph Section (a) is controlling. The paragraph states that, “each separate Compensation Deferral Benefit Accounts, ... as of the last day of the calendar month immediately preceding the date of such Participant’s death.” Therefore that amount to be paid to each Plaintiff in the event of death prior to the commencement of retirement benefits is $57,600.00, plus all accrued interest determined pursuant to paragraph 4.1 of the retirement plan, payable over fifteen years.
It is well settled that a trial court’s finding of fact will not be disturbed unless the record establishes that a factual, reasonable basis does not exist and the finding is clearly wrong or manifestly erroneous. Syrie v. Schillab, 96-1027 (La.5/20/97), 693 So.2d 1173. After a thorough review of the record, we find that the trial court’s determination of benefits in the event that a Participant died prior to the commencement of retirement benefits was not erroneous. Therefore we will not reverse the trial court’s determination of this matter.
CONCLUSION
For the foregoing reasons, we affirm all the rulings of the trial court.
AFFIRMED.

. The Legislature recently amended C.C.P. art. 1915 in La. Acts 1999, No. 1263. However, Section 3 of this Act provides that "[t]he provisions' of this Act shall become effective on January 1, 2000, and shall apply to all actions filed on or after January 1, 2000.” Because the instant action was filed before January 1, 2000, the 1997 version of La. C.C.P. 'art. 1915 is applicáble in this case.