STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

17-738


LOUISIANA DEPARTMENT OF REVENUE

VERSUS

APECK CONSTRUCTION, INC.



**********

APPEAL FROM THE
THIRTIETH JUDICIAL DISTRICT COURT
PARISH OF VERNON, NO. 87,424 B
HONORABLE C. ANTHONY EAVES, DISTRICT JUDGE

**********

JOHN D. SAUNDERS
JUDGE

**********

Court composed of John D. Saunders, Marc T. Amy, and D. Kent Savoie, Judges.


AFFIRMED, IN PART, REVERSED, IN PART.

**Nicole F. Gould Frey**
**David R. Cassidy**
**Breazeale, Sachse & Wilson, LLP**
**P. O. Box 3197**
**Baton Rouge, LA 70821-3197**
**(225) 387-4000**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Apeck Construction, LLC**

**Aaron D. Long**
**Antonio C. Ferachi**
**Brandea P. Averett**
**Adrienne Quillen**
**Attorneys for the Secretary of the Department of Revenue,**
**State of Louisiana**
**P. O. Box 4064**
**Baton Rouge, LA 70821-4064**
**(225) 219-2080**
**COUNSEL FOR PLAINTIFF/ APPELLANT:**
    **Louisiana Department of Revenue**

**SAUNDERS, Judge.**

This is a tax case wherein the trial court found that the Louisiana Department of Revenue (LDR) failed to carry its burden to prove that the taxpayer owed taxes on purchases on materials for resale or on purchases of aggregates. Further, the trial court found that the taxpayer did not owe tax on freight charges to get aggregate into the State via railcar when those charges were passed on to the taxpayer from its sister company.

LDR appeals the trial court's judgment. We affirm, in part, and reverse, in part.

**FACTS AND PROCEDURAL HISTORY**:

LDR conducted a sales and use tax compliance audit of the books and records of Apeck Construction, LLC (AC) for the tax period of January 1, 2007, through December 31, 2009. LDR initially assessed AC with eleven schedules, one for each tax issue involved. After resolution of several issues, only Schedules 2, 5, and 6a remained. Schedule 2 lists tax assessed on purchases of materials used in projects for Graybar Electrical Company, Inc. (Graybar) in which AC invoiced materials and labor separately under multiple contracts dealing with work to be performed at Fort Polk. Graybar's contract with the United States Government was attached as an Exhibit to each of the contracts between Graybar and AC. Further, Graybar gave AC certificates of tax exemption issued by LDR and, according to AC, claimed to be exempt from any taxes. As such, AC did not collect any taxes from its transactions with Graybar.

Schedule 6a involves similar issues to Schedule 2, but does not involve Graybar. Schedule 5 is made up of railroad leasing charges accrued by Williams Equipment Services, LLC (Williams Equipment) and Apeck Aggregate Supply, LLC (AA) in getting aggregates from Texas into Louisiana. Williams Equipment

and/or AA then passed those charges through to AC separately from the aggregates. No sales tax was collected from AC on the amount arbitrated to the railroad leasing charges. Williams Equipment, AA, and AC share common ownership.

LDR filed suit to collect sales and use tax on Schedules 2, 5, and 6a. After hearing testimony from two employees of LDR and the owner of AC, Williams Equipment, and AA, the trial court ruled that the burden was on LDR to prove that any taxes were owed on the transactions in question: purchases for Graybar projects and purchases of aggregate. The trial court found that the purchases by AC for the Graybar projects were sales for resales and, therefore, not taxable, such that LDR failed to sustain its burden. The trial court also found that freight charges are not subject to tax. Thus, the trial court denied LDR the taxes sought from AC though Schedules 2, 5, and 6a. LDR files this appeal, alleging five assignments of error.

**ASSIGNMENTS OF ERROR:**

1. The trial court committed legal error in incorporated [sic] into the construction contracts between Apeck and Graybar certain provisions from Graybar's contract with the United States Government regarding when title to the tangible personal property transferred, when the Government was not a party to those contracts and when the Government's provisions specifically contradicted the express agreements between the parties.

2. The trial court committed error is [sic] finding that title of the tangible personal property transferred from Apeck to Graybar upon delivery of the property to Fort Polk.

3. The trial court committed error in ruling that Apeck reasonably relied upon a resale certificate and blanket exemption certificate presented by Graybar such that the doctrine of equitable estoppel applies to prevent the Department from assessing Apeck with use tax for its own purchases of the tangible personal property at issue here.

4. The trial court committed legal error in ruling that the exception in La. R.S. 47:305.50, which concern the lease of railcars, applied such that the cost to Appek [sic] Aggregate Supply, LLC and Williams Supply, LLC of getting the aggregate to market by railcar

2

did not form part of the taxable sales price when such costs were included in the total costs they charged to Apeck for the aggregate.

5.  The trial court committed legal error in ruling that the Departments [sic] longstanding definition of "sales price" located in its regulation at LAC 61:I.4301 was not valid when it states that any part of the sales prices that is related to costs incurred by the vendor to bring the product to market or make the product available to customers becomes part of the tax base and is subject to sales tax and that costs included in the sales prices are freight or shipping costs from the supplier to the vendor with such costs not be excludable from the taxable sales price.

## ASSIGNMENTS OF ERROR NUMBERS ONE, TWO AND THREE:

LDR's first three assignment of errors deal with use taxes it claims are owed by AC, as a contractor, on all materials AC consumed in the performance of various projects. Schedule 2 lists the tax LDR assessed on the purchases of material used in projects AC performed for Graybar in which AC invoiced materials and labor. Schedule 6a presents the same issues as those in Schedule 2, but are purchases by AC that LDR claims do not involve Graybar.

AC counters that ownership of the materials at issue in Schedules 2 and 6a transferred prior to installation. Thus, according to AC, the materials were sold prior to consumption, i.e., they were sales for resale. Moreover, AC argues that even if the transactions had been shown to be taxable, it detrimentally relied on Graybar's exemption certificate issued by LDR.

The burden to prove that a taxpayer owes tax is on the Department. *See Bridges v. Geoffrey, Inc.*, 07-1063 (La.App. 1 Cir. 2/8/08), 984 So.2d 115, *writ denied*, 08-547 (La. 4/25/08), 978 So.2d 370.

> Where factual findings are pertinent to the interpretation of a contract, those factual findings are not to be disturbed unless manifest error is shown. However, when appellate review is not premised upon any factual findings made at the trial level, but is, instead, based upon an independent review and examination of the contract on its face, the manifest error rule does not apply. In such cases, appellate review of questions of law is simply whether the trial court was legally correct or legally incorrect. (citations omitted).

3

*Evangeline Parish Sch. Bd. v. Energy Contr.*, 617 So.2d 1259, 1265 (La.App. 3 Cir.), *writ denied*, 624 So.2d 1228 (La.1993) (quoting *Borden, Inc. v. Gulf States Utilities Co.*, 543 So.2d 924, 928 (La.App. 1 Cir.), *writ denied*, 545 So.2d 1041 (La.1989)). Contrarily, "[w]hen a trial court's interpretation of a contract is not based upon any factual findings, but, rather, is based upon a review of the contract's language, the manifest error standard of review does not apply." *Derouen v. Nelson*, 09-467, p. 3 (La.App. 3 Cir. 3/10/10), 32 So.3d 1079, 1082.

> "Contracts have the effect of law for the parties" and the "[i]nterpretation of a contract is the determination of the common intent of the parties." The reasonable intention of the parties to a contract is to be sought by examining the words of the contract itself, and not assumed. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." Common intent is determined, therefore, in accordance with the general, ordinary, plain and popular meaning of the words used in the contract. "Accordingly, when a clause in a contract is clear and unambiguous, the letter of that clause should not be disregarded under the pretext of pursuing its spirit, as it is not the duty of the courts to bend the meaning of the words of a contract into harmony with a supposed reasonable intention of the parties." However, even when the language of the contract is clear, courts should refrain from construing the contract in such a manner as to lead to absurd consequences. Most importantly, a contract "must be interpreted in a common-sense fashion, according to the words of the contract their common and usual significance." Moreover, a contract provision that is susceptible to different meanings must be interpreted with a meaning that renders the provision effective, and not with one that renders it ineffective. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.

*Clovelly Oil Co., LLC v. Midstates Petroleum Co.*, LLC, 12-2055, pp. 5-6 (La. 3/19/13), 112 So.3d 187, 192 (footnotes omitted).

First, LDR asserts that the trial court committed legal error in incorporating provisions from Graybar's contract with the United States Government into the contracts between AC and Graybar regarding when title to the property transferred relative to delivery, when the Government was not a party to those contracts

4

between AC and Graybar and when the Government's provisions specifically contradicted the express agreements between AC and Graybar. Next, according to LDR, the trial court erred in finding that title of the tangible personal property transferred from AC to Graybar upon delivery of the property to Fort Polk. Finally, LDR contends that the trial court erred in ruling that AC reasonably relied upon a resale certificate and blanket exemption certificate presented by Graybar such that the doctrine of equitable estoppel applies to prevent it from assessing AC with use tax for its own purchases of the tangible personal property at issue here.

Regarding whether the trial court was legally correct in incorporating provisions from Graybar's contract with the Government, the contracts between AC and Graybar clearly reference the DLA Subcontract Agreement between Graybar and the Government, and that contract is included as an exhibit to the contracts between AC and Graybar. Thus, while LDR chooses to use the word "incorporating" to describe what the trial court did in this matter, the reality is that the trial court simply looked to the language of the contract between Graybar and the Government to help determine whether LDR had carried its burden to prove that AC owed taxes on the property being delivered to Fort Polk. Nothing in the trial court's judgment suggests that the language of the contract between Graybar and the Government replaced any of the language of the contract between AC and Graybar. Nor is there any indication that the contract between Graybar and the Government was somehow incorporated into the contract between AC and Graybar.

LDR argues that the contract between AC and Graybar mandated that the property belonged to AC up until installation because they were construction contracts. Our reading of the contract between AC and Graybar finds no language related to when property ownership would transfer from AC to Graybar or the Government.

LDR reaches its conclusion based on language regarding when Graybar would pay AC for the property it delivered to Fort Polk. That language was such that Graybar would pay AC for the property "within thirty (30) days after Final Acceptance of Project." While it is true that the contract has this language, there is uncontradicted testimony in the record by Joseph Williams, the owner of AC, that the custom between the parties was not this way at all. He testified as follows:

> Q. Explain to us the life cycle of these proposals, contracts, invoices, purchase orders.
>
> A. Graybar comes to use for a different variety of material to be supplied to them and on some occasions they would [] tell us exactly what they wanted and then we would give them a proposal for the materials and the labor if labor was involved in it. . . . when they gave these out to us they specifically told us that these were tax exempt jobs and they gave us the tax exempt certificate. He said, you don't put taxes on this work when you give us this proposal.
>
> . . . .
>
> . . . if we happen to be low bid on the proposal then we were given a purchase order. Once we were given a purchase order then they sometimes gave us a contract, sometimes we just worked off the purchase order number itself, and once that was done we actually went to work. Now, on some of these projects we would - - as we delivered product to each site in every single case a ticket was involved in this work. Very seldom was a project where tickets were not involved in the work.
>
> Q. What kind of tickets?
>
> A. Would be delivery tickets of the materials.
>
> Q. Okay.
>
> A. Once delivery hits the ground that day we gave a copy of that ticket to the Government inspector. . . .
>
> . . . .
>
> Q. Earlier in this hearing the State drummed on and on about there only being payment after final acceptance of your work that might indicate you were delivering immovable property. Is that one hundred percent accurate?
>
> A. That's one hundred percent incorrect.

6

Q.    How so?

A.    Because we invoiced on monthly pay schedules. If it's a large job at the end of the month they counted our tickets and whatever we had they allowed to bill percentage of the job.

Q.    And you received payment, partial payment on contracts?

A.    Yes, we did.

Moreover, regardless of when AC was paid for the materials, there is no language in the contract between AC and Graybar that dictates who owns the property after it is delivered and prior to installation. Rather, there are references to an attached exhibit, the contract between Graybar and the Government. Under that contract, it is written in FAR 52.212-4(j) that:

*Risk of Loss.*

Unless the contract specifically provides otherwise, risk of loss or damage to the supplies provided under this contract shall remain with the contractor until, and shall pass to the government upon:

(1)    Delivery of the supplies to a carrier, if transportation is f.o.b. origin, or

(2)    Delivery of the supplies to the Government at the destination specified in the contract, if transportation is f.o.b. destination.

The plain meaning of this language is that the risk of loss was no longer AC's once the property was delivered. This, coupled with the uncontroverted testimony that AC was customarily paid for materials prior to their installation after invoicing Graybar upon delivery to the Government, makes the trial court's finding that LDR failed to carry its burden of proof legally correct and reasonable, respectively. Thus, we find no error by the trial court in its judgment regarding AC's transactions with Graybar.

This finding renders discussion of whether the trial court's judgment that AC detrimentally relied on Graybar's exemption certificate moot. Much like the

statement made regarding the exemption certificates in the trial court's judgment, any opinion we would make here would be advisory.

Next, we look to those issues dealing with Schedule 6a. In brief, LDR discusses Schedule 6a transactions minimally. No listed assignment of error addresses Schedule 6a specifically, but there is a paragraph dedicated to discussing the issue. Likewise, AC devotes very little argument to Schedule 6a except to note that the issues are the same as those under Schedule 2. LDR states the same, but suggests the Schedule 6a issues do not involve Graybar. AC says at least one item in Schedule 6a does involve a transaction with Graybar. The trial court mentioned Schedule 6a in open court stating, "the purchases listed in Schedule 2 and 6a were sales for resales."

LDR's argument in brief is that AC did not present any evidence to counter its testimony regarding Schedule 6a transactions. As such, according to LDR, the trial court's decision with respect to Schedule 6a is manifestly erroneous.

Ms. Annette Kotynia, a revenue tax auditor with LDR, testified that AC "did not pay sales or use tax on" materials it purchased. Specifically, she stated that AC didn't pay tax on "concrete sand that they went and picked up from TXI[,] hot mix from Prairie Contractors[, and] some field dirt or sand that they bought from Earl Dowden." Her testimony was corroborated by that of Mr. Arthur Champ III, assistant tax director for audit review, sales division with LDR. He testified that "everything related to the lease of a dirt pit was taken out of the Schedule." The remaining items in Schedule 6a dealt with "miscellaneous purchases of materials, field dirt, materials used for something else and, basically, it's just materials used on construction jobs[.]" In reviewing Schedule 6a, after removing those items related to lease of a dirt pit, we read that the remaining vendors are "EARL DOWDEN DIRT PIT, INV: COMMERCIAL BASE TO JOB," "TXI," "PRAIRIE

8

CONTRACTORS, INC," and "M & W TANK CONSTRUCTION CO." LDR is correct that there are no exemption certificates for any of these entities in the record. Thus, once again, discussion of reliance on exemption certificates is unnecessary. However, we note that the only two times the vendor "INV: COMMERCIAL BASE TO JOB" appears in Schedule 6a, the description reads "MATERIALS USED ON FOB PEASON GRAYBAR." If these transactions were under the contracts with Graybar addressed above, then LDR is not entitled to the tax assessed for them.

Regarding the remaining items in Schedule 6a, AC has pointed to no evidence in the record that contradicts Ms. Kotynia and Mr. Champ's testimony that they were taxable. Mr. Williams' testimony dealt with AC's transactions with Graybar and did not address those with the remaining vendors listed in Schedule 6a, and there are no exemption certificates in the record for the vendors listed in Schedule 6a. Accordingly, the trial court's finding that LDR failed to carry its burden to prove that AC owed any tax under Schedule 6a was manifestly erroneous. As such, we reverse the trial court's judgment in that regard subject to the reservation regarding the two transactions where Graybar is referenced in the description.

**ASSIGNMENTS OF ERROR NUMBERS FOUR AND FIVE:**

LDR's final two assignments of error with the trial court's ruling regarding freight. LDR's first assignment is that the trial court committed legal error in ruling that La. R.S. 47:305.50 applied such that the cost to AA and Williams Equipment of getting the aggregate to market by railcar did not form part of the taxable sales price when such costs were included in the total they invoiced AC. The second is that the trial court committed legal error in ruling that LDR's longstanding definition of "sales price" located in its regulation at LA. ADMIN. CODE

9

tit. 61, pt. I, § 4301 was not valid when it states that any part of the sales prices that is related to costs incurred by the vendor to bring the product to market or make the product available to customers becomes part of the tax base and is subject to sales tax and that costs included in the sales prices are freight or shipping costs from the supplier to the vendor with such costs not be excludable from the taxable sales price.

These assignments of error pose questions of law wherein the applicable standard of review is de novo. *See Navarre Chevrolet, Inc. v. Begnaud*, 16-465 (La.App. 3 Cir. 11/2/16), 205 So.3d 973, *writ denied*, 16-2122 (La. 1/13/17), 215 So.3d 248. When conducting a review of questions of law, appellate courts merely determine whether the lower court was legally correct. *Sanchez v. La. Nursery*, 09-1247 (La.App. 3 Cir. 4/7/10), 34 So.3d 1047.

> Tax exemptions are strictly construed in favor of the State and "must be clearly and unequivocally and affirmatively established" by the taxpayer. *Vulcan Foundry, Inc. v. McNamara*, 414 So.2d 1193, 1197 (La.1982). Exclusions, on the other hand, are "construed liberally in favor of the taxpayers and against the taxing authority." *Wyesco of Louisiana, LLC v. East Feliciana Parish School Board*, 2000-1322, p. 5 (La.App. 1 Cir. 9/28/01), 809 So.2d 401, 404, *citing Tarver v. World Ship Supply, Inc.*, 615 So.2d 423, 426 (La.App. 4 Cir.1993), *writ denied*, 616 So.2d 672 (La.1993).

*Harrah's Bossier City Inv. Co., LLC v. Bridges*, 09-1916, p. 10 (La. 5/11/10), 41 So.3d 438, 446. Louisiana Revised Statutes 47:305.50(E)(1) states, "[t]he sales and use tax imposed by the state of Louisiana or any of its local political subdivisions or statewide taxing authorities shall not apply to rail rolling stock sold or leased in this state."

In the case before us, the trial court's judgment on this issue succinctly states that "freight charges are not subject to tax." The language in La.R.S. 47:305.50 clearly is such that the cost of leasing the railcar to bring the aggregate from Texas

10

to AA or Williams Equipment is not taxable. The issue before us is whether that cost became taxable when AA or Williams Equipment passed it through to AC.

LDR argues that the rail lease costs associated with the transportation of the aggregate from Texas to AA and Williams Equipment would be considered part of their overhead, i.e., part of their selling price when those costs were passed through to AC, even though it was not included in the sale price they charged to AC on any invoice. Thus, the entire amount AC paid to either AA or Williams Equipment should be subject to tax per La.R.S. 47:301(13)(a) as part of the "sales price" of an item. Louisiana Revised Statutes 47:301(13)(a) defines "sales price" as:

> the total amount for which tangible personal property is sold, less the market value of any article traded in including any services, except services for financing, that are a part of the sale valued in money, whether paid in money or otherwise, and includes the cost of materials used, labor or service costs, except costs for financing which shall not exceed the legal interest rate and a service charge not to exceed six percent of the amount financed, and losses; provided that cash discounts allowed and taken on sales shall not be included, nor shall the sales price include the amount charged for labor or services rendered in installing, applying, remodeling, or repairing property sold.

Mr. Champ testified that while "sales price" may be defined as such under La.R.S. 47:301(13)(a), LDR actually uses its longstanding definition of "sales price" located in its regulation at LA.ADMIN.CODE tit. 61, pt. I, § 4301, which states:

> R.S. 47:301(13)(a) defines sales price as the total amount, including cash, credit, property, or services, that is received or paid for the sale of tangible personal property. Any part of the sales price that is related to costs incurred by the vendor to bring the product to market or make the product available to customers becomes part of the tax base and is subject to sales tax even if a separate charge is made on the invoice.

The fourth circuit, in *Pontchartrain Materials Corp. v. Plaquemines Parish Government*, 03-1444 (La.App. 4 Cir. 3/31/04), 871 So.2d 1171, *writ denied*, 04-1093 (La. 9/3/04), 882 So.2d 606 and *writ denied*, 04-1152 (La. 9/3/04), 882 So.2d

607, found that freight charges were not part of the "sales price" for purposes of imposing a tax. The basis for the ruling is that "[t]he plain language used to define sales price does not provide for the inclusion of transportation and freight charges as part of its taxable base." *Id.* at 1175. The fourth circuit looked to the language in our Legislatively-created La.R.S. 47:301(13)(a) to reach this conclusion. *Id.*

LDR's argument that "freight in" constitutes overhead that becomes part of the sales price is not based on Legislatively-created law, nor is it based on jurisprudence. The testimonies of Ms. Kotynia and Mr. Champ assume that a business will pass the "freight in" costs to the buyer of the product so as not to take a loss on bringing the product to market. While this line of thinking may seem reasonable, it can also apply to any costs to bring a product to market, even those that are specifically excluded by law as not taxable. To reiterate, the burden to prove that a taxpayer owes tax is on the Department. *Geoffrey*, 984 So.2d 115. LDR has provided no such proof.

Given this burden of proof, we agree with the fourth circuit and find no merit to these assignments of error. Accordingly, we affirm the trial court's judgment regarding Schedule 5.

**CONCLUSION:**

The Louisiana Department of Revenue raises five assignments of error. We find no error by the trial court in its judgment regarding Apeck Construction, LLC's tax burden in relation to transactions with Graybar Electrical Company, Inc. Further, we find no error by the trial court in finding that Apeck Construction owed no tax on freight. However, we reverse the trial court's judgment regarding the specified items in Schedule 6a. Total costs in the amount of $3,687.11 are

12

assessed against the Louisiana Department of Revenue.

**AFFIRMED, IN PART, REVERSED, IN PART.**